JAMES LOUDON & CO. (J. SEILER, INC.) ET AL. v. UNITED STATES

**No. 5699.**—Invoices dated Antwerp, Belgium, June 24, 1938, etc.
Entered at Los Angeles, Calif., July 2, 1938, etc.
Entry No 14, etc.

(Decided August 19, 1942)

*Harper & Harper* (*Abraham Gottfried* of counsel), and *Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) associate counsel, for the plaintiffs.

*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh* and *William J. Vitale*, special attorneys), for the defendant.

OLIVER, Presiding Judge: These five appeals to reappraisement, which were consolidated for the purposes of trial, involve the proper dutiable value of certain cut diamonds exported from Belgium and entered at the port of Los Angeles.

In reappraisement 134305–A, the merchandise was entered at the invoice unit values and it was appraised at those values plus 3 per centum. In the remaining four cases, the merchandise was entered under duress at the invoice unit values plus 3 per centum to meet the advance made by the appraiser in the first case.

The action of the appraiser is shown by his red-ink notation which appears on the invoice with reappraisement 134305–A. The said notation reads as follows:

Basis of app.—Ex. V. appraised at invoice units plus 3% (com. or profit).

There is no question but that export value is the proper basis of appraisement, and there is no dispute concerning the unit invoice values of the merchandise. The sole question is whether the advance of 3 per centum, which the appraiser refers to as a "commission" or a "profit," should be included as part of the dutiable value.

Plaintiffs introduced the evidence of two witnesses, both connected with the plaintiff corporation, whose business is the purchase and sale of diamonds.

On the trial of this case at Los Angeles, the secretary of the plaintiff-corporation testified that he sold in this country the diamonds which

were purchased in Belgium through the president of his concern. He testified that when he orders diamonds he does so by letter wherein he sets forth specifications for the kind of stones he wants. Concerning the diamonds in question, he testified that the prices paid therefor are those set forth on the invoices and that these were purchased through the president of the corporation who is located at Antwerp, and no commission was paid. The purchases were paid for out of money advanced to the president who works for the corporation on a strict salary basis, without any commission allowance.

At a later hearing held at the port of New York, the president of the plaintiff-corporation testified that he had been engaged in the diamond business for 20 years, both in the United States and in Europe. He stated that he worked in the United States until 1933 producing and selling polished diamonds. From 1933 to 1940, he was permanently located in Antwerp, one of the principal diamond markets in Belgium, where he bought cut diamonds for his firm as a member of the "Diamond Bourse," which he compared to the Curb Exchange in New York. At this so-called diamond exchange, manufacturers assemble and display and offer their stones to prospective buyers. The witness further testified that he purchased the merchandise covered by the five appeals under consideration and that the prices paid were the invoice prices and are prices at which anyone could have bought such merchandise in the foreign market for exportation. He stated that these prices represent the market value at the time of exportation of the merchandise at bar and that the prices of diamonds bought for home consumption were no higher than those for such merchandise bought for export. He further stated that some of the items in question include a commission of 1 per centum which is included in the purchase prices.

The evidence offered on behalf of the defendant was entirely documentary, consisting of two special agent's reports (defendant's exhibits 1 and 2), and a circular letter of the Customs Information Exchange dated July 25, 1939, which was admitted as defendant's exhibit 3. This circular letter is addressed to "Customs Officers" and embodies a letter sent by the Commissioner of Customs to the United States Appraiser of Merchandise at the port of New York. The latter purports to outline the diamond business as transacted in Belgium and is based on a number of reports that are listed therein. Two of those reports are exhibits 1 and 2 in the present case. The contents of the letter seem to be the conclusions reached after an examination of the reports mentioned. In my judgment, this circular letter, exhibit 3, has little, if any, evidentiary value in reaching a proper determination of the issue presented herein.

The two special agent's reports, defendant's exhibits 1 and 2, contain much that is corroborative of the oral testimony of plaintiffs'

witnesses. They verify the correctness of the consular invoices and confirm the statements of the witnesses that the invoice prices include a 1 per centum selling commission. There is evidence in these reports that substantiates the testimony of the witnesses with respect to their business relationship. The reports also state that Antwerp is one of the principal markets for diamonds in Belgium, and that such business there is conducted in so-called "Diamond Clubs," where transactions between buyers and sellers are consummated.

The report, exhibit 2, states in detail the general practice followed in the Antwerp market in buying and selling diamonds. That report reads, in part, as follows:

In theory any buyer may come to Antwerp and purchase diamonds without the assistance of a resident dealer and without paying a buying commission. The Antwerp diamond market is, however, so organized that most importers consider it best to buy through established dealers and pay a buying commission.

Seven different buying practices followed in the Antwerp diamond market are set forth in the said report. The two methods which, it is stated, prevail in most cases are described therein as follows:

6. Antwerp dealer receives order from the importer and subsequently buys merchandise to fill the order with his own credit and in his own name. Merchandise is shipped to the importer in original lots. Buying commissions vary from 1 to 5%. (Many cases in this division.)

8. Antwerp dealer receives order from importer and subsequently purchases merchandise in excess of the order from which he makes selections and classifications to meet the importer's specifications. Left over goods are held in the dealer's stock or resold on the Antwerp market. Purchases are made in the dealer's name and with his credit and the importer pays after shipment. Buying commissions vary from 2 to 5%. (Many cases in this division.)

The same report further states as follows:

The advantages of doing business through an established dealer are numerous. The most important, however, are:

1. The security of dealing with responsible parties.
2. The advantage of having the advice and assistance of an expert who is in close contact with the market. It is generally admitted that experts may vary as much as 10% in their appraisal of cut diamonds. Two or more experts are less apt to buy over-valued goods.

The ordinary course of trade in this industry is for importers to buy through dealers established on the Antwerp market and to pay a buying commission.

\* \* \* \* \* \* \*

In view of the above, it appears that aside from credit risks, personal relations, etc., the normal buying commission or dealer's profit on the Antwerp market is 1% for goods shipped in the original lots as purchased, and 2% for goods graded and classified by the dealer. Commissions in excess of these percentages are usually due to interest charges, credit risks involved, or to personal relations between the importer and the dealer.

Based upon the foregoing facts, it is my judgment, and I so hold, that in the ordinary course of trade in Antwerp, one of the principal

markets in Belgium, diamonds are bought through dealers who receive a buying commission for their services.

There is nothing in the two reports, defendant's exhibits 1 and 2, that supports the appraiser's action in adding 3 per centum to the invoice unit values. The plaintiffs have testified that no such commission or profit was charged, and this has not been contradicted. The only reference to a 3 per centum "commission" or "profit" is found in the letter dated July 21, 1939, which was promulgated by the Customs Information Exchange on July 25, 1939, as C. I. E. 1074/39, which is exhibit 3 in the case at bar. In the letter referred to, the following statement appears:

It may be stated, however, that the records before the Bureau indicate that at the time covered by such records the "commission" or "profit" be included in the case of *intact lots is probably 2%* of the cost to the dealer and in the case of *reassorted or selected lots 3%* of the cost to the dealer.

In all of the shipments in question, the diamonds were unassorted, save possibly that covered by reappraisement 134305–A. As to that case, the president of the plaintiff corporation testified that he believed it was "bought as is. I wouldn't swear to this."

If the records to which reference is made in the above quotation are defendant's exhibits 1 and 2 herein, then the statement is wholly without foundation because neither of those reports contains anything to support the position that a 3 per centum "commission" or "profit" is added to the invoice unit values of diamonds in the ordinary course of trade in Antwerp, Belgium.

Even if a "commission" or "profit" had been added to the unit invoice values as charges paid to resident buyers in Antwerp for their services as outlined in the report, defendant's exhibit 2, such an addition would not apply to the dutiable value of the merchandise. The work performed by those individuals facilitates the purchase and shipment of diamonds, and the financing of purchases, but in no way affects the value for duty purposes.

The case of *United States v. Barnett*, Reap. Dec. 5353, involved an issue similar to that presented herein. Like the instant case, the question there was the proper dutiable value of diamonds imported from Antwerp, Belgium. It was a collector's appeal in which that official sought to have added to the importer's entered value a so-called 2 per centum commission as a part of the proper dutiable value of the merchandise. The court held that the disputed item was not dutiable, and in reaching its conclusion said:

This [the 2 per cent so called commission] no more constitutes a part of the dutiable foreign value as a seller's commission or profit, or in any other way, than would the cost of a buyer's steamship tickets or his hotel or restaurant bills.

The same language is applicable to the 3 per centum advance over the invoice unit values that is in question here.

For the reasons hereinabove set forth, I hold that the proper basis of appraisement for the diamonds in question is export value and the proper dutiable export values thereof are the invoice unit values. Judgment will be rendered accordingly.